UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | } | |
| | } | |
| **Plaintiff** | } | |
| | } | |
| **v.** | } | Case No.: 2:19-CR-325-ACA-HNJ |
| | } | |
| **VICTOR MULATO-HERRARA,** | } | |
| | } | |
| **Defendant.** | } | |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant Victor Manuel Mulato-Herrara's ("Mr. Mulato") motion to suppress evidence. (Doc. 12). In May 2019, the United States indicted Mr. Mulato on one count of possession of a firearm by an illegal alien, in violation of 18 U.S.C. § 922(g)(5)(a). (Doc. 7). Mr. Mulato moves to suppress evidence of a Springfield Armory XD 9mm gun found in his home during a warrantless search and any statements made to law enforcement on the night of his arrest. (Doc. 12 at 1).

1

A. <u>Findings of Fact</u>

Based on the evidence presented at the suppression hearing, the court finds that at midnight on April 22, 2019, Shelby County Sheriff's Office received a call from Mr. Mulato's wife, J.T. (GX 7). J.T. reported that she left the family home because she and Mr. Mulato were fighting. *Id.* When she returned, she entered the home and picked up one of her three children. (Doc. 25 at 10-11). Mr. Mulato "grabbed" her son from her, placed him in a bedroom and shut the door. (*Id.* at 10.) About a minute later, Mr. Mulato left the child in the bedroom and went into the living room, where he approached J.T. with a gun, cocked the trigger, and told her to leave the home. (*Id.*; *see also* GX 7). J.T. retreated to her mother's house and called 911. (Doc. 25 at 9).

During the call, J.T. told the dispatcher that three children remained in the home. (*Id.* at 11). J.T. denied any reason to think Mr. Mulato would hurt the children and told the dispatcher that Mr. Mulato had never threatened them, been physical with them, or hurt them before. (*Id.* at 11–12). She was unsure whether Mr. Mulato was intoxicated and did not know if Mr. Mulato had any other weapons inside the home. (*Id.* at 12–13). Based on this information, the Shelby County Sherriff's Office dispatched deputies to investigate a person with a weapon. (Doc. 25 at 25; *see also* GX 7).

Shelby County Deputies Maddox, Smith, and O'Brien and the deputies' supervisor, Sargent Brand, responded to the call. (*See* Doc. 25 at 47). All four law enforcement officers arrived in separate vehicles (*see* GX 7) and all four arrived in full uniform (doc. 25 at 47). Cameras and microphones in the vehicles driven by Deputies Maddox, Smith, and O'Brien recorded the events described below. Although the camera footage does not reveal a visual picture of what happened at Mr. Mulato's door or inside their home, the recordings do include audio of the incident.

Deputies Smith and Maddox arrived first on the scene and repeatedly knocked on the front door, announcing they were with the Sheriff's Office. (Doc. 14 at 4; Doc. 25 at 68). Deputy Smith testified that the home was a single-wide mobile home and that they knocked loudly enough that Mr. Mulato "definitely would have heard" them. (Doc. 25 at 68). For the next eight minutes, the deputies knocked, and Mr. Mulato ignored them. (*Id*. at 44). Clearly unmoved by Mr. Mulato's obvious lack of desire to cooperate with the officer's investigation, Officer Maddox contacted 911 Dispatch and requested that the dispatcher call J.T. back, get Mr. Mulato's cell phone number, call Mr. Mulato, and instruct him to come to the door. (*Id*. at 17, 21, 44).

The 911 dispatcher contacted Mr. Mulato, who informed the dispatcher that he did not have any guns on the premises. (Doc. 25 at 44). The dispatcher then instructed Mr. Mulato to go to the door and speak to the officers, and Mr. Mulato

complied. (*Id*. at 21). Deputy O'Brien and Sargent Brand arrived at the scene as Deputies Maddox and Smith made contact with Mr. Mulato at his front door. (*Id*. at 27, 47, 120).

Deputies Maddox and Smith testified that they observed Mr. Mulato as polite and calm and without obvious signs of intoxication. (Doc. 25 at 35, 88). At some point, the officers found their way into Mr. Mulato's home, although *how* they found themselves inside the home is disputed. Mr. Mulato denies giving the deputies permission to enter the house. Deputy Maddox testified that he asked Mr. Mulato if the deputies could come inside the house and Mr. Mulato stepped back from the doorway. (Doc. 25 at 31, 49). Deputy Smith initially testified that Deputy Maddox asked Mr. Mulato if they could enter the house. (*Id*. at 89). Later, when confronted with the fact that the audio recording did not contain Deputy Maddox asking for consent to enter the home, Deputy Smith testified that he didn't know if Deputy Maddox verbally asked for permission or "we just maybe did a hand gesture indicating like can we come in and he just moved out of the way." (*Id.* at 101).

The deputies' accounts[1] of *when* they entered the home differ. Deputy Maddox testified that he entered almost immediately after Mr. Mulato opened the door. (Doc. 25 at 27). Deputy Smith testified that the deputies remained on the porch for most of the questioning and entered the home only when he asked Mr.

---

[1] Sargent Brand did not testify.

4

Mulato about the children. (*Id*. at 98). Deputy O'Brien was around the back of the house when Mr. Mulato opened the door, and therefore did not know how long the deputies were on the porch before they entered. (*Id*. at 51).

The deputies' accounts of *why* they went in the home and *what* they did once inside the home also differ. According to Deputy Smith, the purpose of contacting Mr. Mulato was to investigate the allegation that he pointed a gun at J.T. (Doc. 25 at 68–69). He characterized this investigation as his "first priority." (*Id.* at 77). Deputy O'Brien concurs with Deputy Smith, testifying that finding the weapon—not the safety of the children—was the "main focus" of the investigation. (*Id.* at 131). Only Deputy Maddox testified that his "first objective" was the safety of the children. (*Id.* at 50).

Once inside the home, the deputies agree that Deputy O'Brien immediately patted Mr. Mulato down and instructed him to sit on the couch. (Doc. 25 at 30, 53, 57, 97, 99). But what happened next is in dispute. Deputy Smith testified that both he and Maddox were in the living room together with Mr. Mulato while they asked preliminary investigative questions. (*Id*. at 75). Deputy Maddox testified that he entered the home and immediately went to look for the children and perform a protective sweep.[2] (*Id*. at 56). In the living room, Deputy Smith asked Mr. Mulato

---

[2] Deputy Maddox testified that he announced he was going to look for the children immediately upon entering the house. (Doc. 25 at 27). The audio recording does not reflect this announcement.

5

about the children. (*Id.* at 71). According to Deputy Smith, Mr. Mulato indicated that a child was in the room to his left, and Deputy Smith walked over to that bedroom door and looked in on that child. (*Id*. at 71-72).

At least three, but sometimes four, law enforcement officers were present while Mr. Mulato was questioned. Once the children were located and the deputies determined that the children were "good to go" (doc. 25 at 50), Deputy Maddox asked, "any guns in the house?" (*id.* at 58). Mr. Mulato "volunteered" that the gun was located under the mattress in one of the bedrooms. (*Id*. at 33–34, 53). At the time Mr. Mulato "volunteered" this information he was detained and being questioned by Deputy O'Brien. (*Id*. at 54, 114).

After Mr. Mulato told the deputies where to find the gun, Deputies Smith and Maddox went to look for it. (Doc. 25 at 133). The deputies located the gun in a bedroom at the end of the house. (*Id*. at 128). Immediately after locating the gun, Deputy O'Brien placed Mr. Mulato under arrest for menacing. (*Id*. at 33).

B. Analysis

Mr. Mulato moved to suppress the gun and his statements regarding its location, claiming the deputies violated his Fourth Amendment and *Miranda*[3] rights. Mr. Mulato contends that the deputies' entry into, and subsequent search of, his home was unlawful because the deputies did not have a warrant or a reasonable

---

[3] *Miranda v. Arizona*, 384 U.S. 486 (1966).

6

belief that an exception to the warrant requirement existed.  For that reason, Mr. Mulato asks this court to suppress evidence of the gun.  In addition, Mr. Mulato argues that the statements he made regarding the gun's location were made during a custodial interrogation, which took place without the benefit of *Miranda* warnings.  Mr. Mulato therefore asks the court to suppress evidence of his statements regarding the gun's location.

   1. *The Search of the Home*

The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures[.]"  U.S. Const. amend. IV.  "[W]hen it comes to the Fourth Amendment, the home is first among equals.  At the Amendment's 'very core' stands 'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'"  *Florida v. Jardines*, 569 U.S. 1, 6–7 (2013) (quoting *Silverman v. United States*, 365 U.S. 505, 511 (1961)).  Given this privileged status, warrantless searches are considered presumptively unreasonable "subject only to a few specifically established and well-delineated exceptions."  *Katz v. United States*, 389 U.S. 347, 357 (1967).

In this case, two exceptions to the warrant requirement are at play.  The United States contends that the deputies' warrantless entry into the home falls under both the voluntary consent exception and the exigent circumstance exception.  (Doc. 14

at 2). The United States bears the burden of proving by a preponderance of the evidence that its reliance on these exceptions was justified. *United States v. Matlock,* 415 U.S. 164, 177 (1974).

a. *Voluntary consent to the deputies' entry into the home*

The United States argues that Mr. Mulato consented to the deputies' entrance into his home and subsequent search. (Doc. 14 at 7). Mr. Mulato counters that the deputies entered the home through intimidation, not consent, and that the search was therefore unconstitutional. (Doc. 27 at 11).

As an initial matter, the court notes that consent to enter the home is not the same as consent to search the home. *See United States v. Ramirez-Chilel*, 289 F.3d 744, 751–53 & 752 n.9 (11th Cir. 2002) (finding, first, that the defendant consented to the officers' entry into the home and then, separately, that the defendant consented to the officers' search of the home). Although the United States's opposition to the motion to suppress repeatedly refers to consent in the context of both the "entry and search," it substantively addresses only the deputies' entry into the home.[4] The court

---

[4] The United States generally argues that Mr. Mulato impliedly consented to the deputies' entering his home. (Doc. 14 at 7 (*citing Birchfield v. North Dakota*, 136 S.Ct. 2160, 2185 (2016)). To the extent the United States' contention could be read to include consent to search the home as well, the court rejects this argument. *Birchfield* involves the search of a car. *See id.* A home is different. "Under the Fourth Amendment, the home is a sacrosanct place that enjoys special protection from government intrusion." *Moore v. Pederson*, 806 F.3d 1036, 1039 (11th Cir. 2015). For that reason, "whatever relevance the implied consent doctrine may have in other contexts, it is inappropriate to sanction entry into the home based upon inferred consent." *McClish v. Nugent*, 483 F.3d 1231, 1241 (11th Cir. 2007) (*citing United States v. Gonzalez,* 71 F.3d 819, 830 (11th Cir.1996) (abrogated on other grounds)).

therefore limits its analysis to whether Mr. Mulato gave his consent for the deputies to enter his home.

To sustain its burden of proving consent to enter the home, the United States must show that Mr. Mulato's consent to enter was "'essentially' the 'free and unconstrained choice' of the occupant." *United States v. Morales*, 893 F.3d 1360, 1367 (11th Cir. 2018) (*quoting United States v. Purcell*, 236 F.3d 1274, 1281 (11th Cir. 2001)). This question of fact is determined from the totality of all the circumstances. *Schneckloth v. Bustamonte,* 412 U.S. 218, 227 (1973). Relevant factors for the court to consider in making this determination include: (1) the voluntariness of the person's custodial status, (2) "the presence of coercive police procedure," (3) the extent of the person's cooperation with law enforcement, (4) whether the person knew that he could refuse consent, and (5) the person's "education and intelligence." *Gill, as Next Friend of K.C.R. v. Judd,* 941 F.3d 504, 2019 WL 5304078, at *10 (11th Cir. Oct. 21, 2019) (citation omitted).

The United States argues that the evidence "shows the deputies did not use coercive measures to enter the home" because they repeatedly knocked at the door (as opposed—presumably—to more extreme measures). (Doc. 28 at 3-4 (emphasis added). The court is not persuaded. Law enforcement has implied permission to knock, wait briefly for a response (and leave if there is no response), and seek permission to enter from the owner or occupant. *Jardines,* 569 U.S. at 8. In this

case, the officers knocked and announced their presence, waited, knocked and announced their presence again, waited, and knocked again. This continued for eight minutes without a response from Mr. Mulato, whom the deputies knew to be inside. Undeterred by the fact that Mr. Mulato obviously did not want to speak to them, the deputies then called dispatch, instructed dispatch to call J.T. back, get Mr. Mulato's phone number, and call him to instruct him to answer the door. *Cf. Kentucky v. King*, 563 U.S. 452, 470 (2011) (stating that when the police knock on a door, "the occupant has no obligation to open the door or to speak, and citing with approval Judge Sutton's dissent in *U.S. v. Chambers,* 395 F.3d 563, 577 (6th Cir. 2005 ), in which he stated that if officers knock and "no one answers the door (even if the residents are home), when no one at the home is willing to talk about the matter or when no one at the home does anything incriminating . . . . [t]he officer will have to leave")).

Once at the door with the deputies, Mr. Mulato saw three to four uniformed law enforcement officers, at least one with his gun drawn. The audio recording of what transpired next does not capture any deputy requesting permission to enter the home. Considering the audio evidence, the best any deputy could offer is that maybe another one of the uniformed deputies made some undefined "gesture" to secure entry into the house. According to this deputy, once this gesture might have

occurred, Mr. Mulato immediately stepped back.  Given Mr. Mulato's initial refusal to even come to the door, that must have been quite some gesture.

There is also no evidence that the deputies informed Mr. Mulato, a person of unknown education and fluency in English, of his right to refuse permission to enter the home.  And, while this factor is not dispositive to a finding of voluntariness, *Schneckloth,* 412 U.S. at 227,  an objectively reasonable person in the same circumstance would have thought that his *only* choice was to allow the deputies in his home given that they ignored his eight-minute long refusal to answer the door—a "conspicuously low point" of their investigation, *see Chambers*, 395 F. 3d at 577 (Sutton, J., dissenting)—and then confronted him with at least one drawn weapon when he did at last answer the door, *cf. United States v. Edmonson*, 791 F.2d 1512, 1515 (11th Cir. 1986) ("A suspect does not consent to being arrested within his residence when his consent to the entry into his residence is prompted by a show of official authority.").

Considering the foregoing, the court finds that Mr. Mulato did not freely and voluntarily give his consent for the deputies to enter his home.  Thus, the court must address whether the other proffered exception to the warrant requirement—the existence of exigent circumstances—was present.

*b.     Exigent Circumstances*

The warrant requirement to search a home is excepted where the "exigencies of the situation make the needs of law enforcement so compelling that the warrantless [entry] is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393–94 (1978). To invoke the exigent circumstances exception, officers must have "probable cause to believe that exigent circumstances exist." *Smith v. LePage*, 834 F.3d 1285, 1293 (11th Cir. 2016).

Mr. Mulato does not dispute that the deputies had probable cause to believe that exigent circumstances existed sufficient to warrant the deputies' welfare check on the children. Instead, he argues that the exigency ended once the deputies determined that the children were, in the words of Deputy Maddox, "good to go." (Doc. 27 at 12; Doc. 25 at 50). At that point, according to Mr. Mulato, the deputies were required to leave the house without exploring the premises further. (Doc. 27 at 12) (quoting Wayne R. LaFave, Search and Seizure § 6.6(a) (5th ed. 2015). The court agrees.

The United States argues that the exigency remained even after the deputies confirmed the children's welfare because the officers could not be sure of the children's *continued* safety. (Doc. 28 at 10) (exigency remained "[b]ased on the information they had been given: [that he] snatched a child from his wife, pointed and cocked a gun at his wife, kicked her out of the house, remained in the house with

12

the three children and the gun, was of unknown intoxication, and might be further enraged by the fact that his wife called 911.") The evidence does not support the United States' argument.

Despite the United States' suggestion that the deputies found an enraged and possibly intoxicated Mr. Mulato, giving rise to a continued belief that the children were in danger from him, the deputies testified that Mr. Mulato was calm (doc. 25 at 35), "very cooperative" (*id*. at 76), and without signs of intoxication (*id*. at 35). Moreover, J.T. had told dispatch—who passed the information on to the deputies — that Mr. Mulato had never harmed or threatened the children. (*See* GX 7.) The deputies admitted that they considered the exigency over once they found the children all safely asleep in bed with no evidence that Mr. Mulato was a threat to them. (*Id*. at 52–53).

Despite this evidence, the United States argues that deputies would be leaving the children's safety to chance by waiting for a search warrant to locate the evidence they sought. (*See* Doc. 28 at 10) (arguing that waiting for a warrant would require the deputies to "keep their fingers crossed that [Mr. Mulato] . . . was stable enough to remain alone with the children until a warrant was obtained"). According to the United States, the deputies had no choice but to stay in the home and ask about the gun. (*Id.* at 11). The deputies did have other choices, though—for example,

following J.T.'s own suggestion that they request permission from Mr. Mulato to collect the children and bring them to her.

More importantly, the assumption underlying the United States' argument is that the deputies sought the "evidence" (the gun) because of the exigency (the fear for the children's safety). The evidence presented at the suppression hearing, however, establishes that the deputies sought the gun in relation to the crime J.T. had reported (menacing), not the exigency the officers feared (the welfare of the children). Asked why there was an interest in the gun after the officers confirmed that the children were fine, Deputy Smith testified, "at that point we want[ed] to see if that weapon is—investigate to see if that weapon was the weapon involved in the crime." (Doc. 25 at 79). Deputy O'Brien characterized finding the weapon as the "main focus" of the investigation *followed by* checking on the children. (Doc. 25 at 131 (emphasis added)). Putting aside the deputies' subjective reasons for their search, the court reiterates its conclusion that a reasonable officer would have believed the exigency was over after finding the children safe and Mr. Mulato in a calm and sober state.

The court finds that the deputies' interest in finding the gun was not related to the children's safety, but instead to their interest in finding evidence of the crime of menacing. And although the officers undisputedly had probable cause to believe that Mr. Mulato had committed that crime, and that the house contained evidence of

that crime, probable cause to believe evidence of a crime exists is not probable cause to believe an exigency exists. If it were, the police would never need a warrant where they believe a house contains evidence of a crime. In this case, the deputies did have probable cause to believe that Mr. Mulato had committed a crime and that he harbored evidence of that crime; they also, for a time, had probable cause to believe that an exigency warranted their warrantless entry into Mr. Mulato's house. The probable cause to believe Mr. Mulato had committed a crime and possessed evidence of that crime persisted, but the exigency supporting the warrantless entry did not. Once that exigency ended, the deputies needed to obtain a warrant or satisfy some other exception to the warrant requirement before they could search Mr. Mulato's house. *See United States v. Santa*, 236 F.3d 662, 676 (11th Cir. 2000) (stating that a consent search can be constitutional despite an illegal entry). This they did not do.

Because the officers lacked a warrant to search Mr. Mulato's house, and the United States has not met its burden of establishing that some exception to the warrant requirement was present, the court **WILL GRANT** the motion to suppress the evidence found during the unconstitutional search.[5] The next question is whether

---

[5] The United States also urges that the gun is admissible under *United States v. Patane*, 542 U.S. 630, 633–34 (2004). (Doc. 28 at 12). The *Patane* decision held only that "*Miranda* does not require the exclusion of physical evidence that is discovered on the basis of a voluntary, although unwarned, statement." *United States v. Jackson*, 506 F.3d 1358, 1361 (11th Cir. 2007). Unlike this case, the *Patane*

15

Mr. Mulato's statements to the officers in response to their questioning must also be suppressed.

2. *The admissibility of Mr. Mulato's statements to the police*

Mr. Mulato challenges the admissibility of the statements he made regarding the location of the gun because the deputies did not give him his *Miranda* warnings prior to questioning him. (Doc. 27 at 13). The United States counters that the statements are admissible because Mr. Mulato was not in custody at the time he made the statements. (Doc. 14 at 14-15; Doc. 28 at 12). Alternatively, the United States argues the public safety exception applies because the deputies needed to ensure that Mr. Mulato did not use the gun against them or the children. (Doc. 14 at 15). Because *Miranda* applies only when a suspect is in custody, the court will address that argument first.

The Fifth Amendment to the United States Constitution guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. This extends to "individuals subjected to custodial interrogation by the police." *New York v. Quarles*, 467 U.S. 649, 654 (1984). "[I]nterrogation in certain custodial circumstances is inherently coercive and . . . statements made under those circumstances are inadmissible unless the suspect is

---

decision did not involve an unlawful search; it involved a lawful search conducted based on statements that were, themselves, inadmissible at trial. *See* 542 U.S. at 634–35, 645.

16

specifically informed of his Miranda rights and freely decides to forgo those rights." *Id.* (footnote omitted). So the first question for the court is whether Mr. Mulato was in custody when he told the police about the presence of the gun.

"Custody" deprives a suspect of his freedom of movement. *See Howes v. Fields,* 565 U.S. 499, 518 (2012). Whether someone is in custody is determined by asking whether, under the totality of the circumstances, a reasonable person would not feel free to end the interrogation and leave. *See id.* This test is from the perspective of a reasonable innocent person, and "the actual, subjective beliefs of the defendant and the interviewing officer on whether the defendant was free to leave are irrelevant." *United States v. Brown*, 441 F.3d 1330, 1347 (11th Cir. 2006) (quoting *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996)).

Interviews in a suspect's home are generally *much less likely* to be considered custodial. *U.S. v. Brown*, 441 F.3d 1330, 1348 (11th Cir. 2006). However, this situation is different from an interview where the suspect is free to eat, smoke, use the phone, and move about as he wishes. From the moment that the deputies arrived on the scene, it was a "police-dominated atmosphere" in which the deputies insisted that Mr. Mulato answer their questions about his altercation with his wife. By the deputies' own testimony, Mr. Mulato was frisked, instructed to sit on the couch, and thereafter surrounded by at least three officers. He was not told that he was free to leave. In fact, Deputy Maddox testified that Mr. Mulato was "not free to move."

(Doc. 25 at 54). And, Deputy Maddox's question—asked after he completed a four minute, plain view search of the home—assumed the presence of a gun and demanded its location. A reasonable person would not have understood his detention to be "temporary and brief" considering the deputies refused to leave when Mr. Mulato ignored their knocking and thereafter remained in the house after satisfying themselves of the children's safety. *Cf. United States v. Luna-Encinas,* 603 F.3d 876, 880 (11th Cir. 2010).

The court finds that Mr. Mulato was in custody. Moreover, it is undisputed that no one explained Mr. Mulato's *Miranda* rights to him. The United States argues that under the public safety exception to *Miranda*, the officers did not need to read Mr. Mulato his *Miranda* rights. The United States posits that the children could have woken up and accidentally used the gun. This argument strains reason. First, the deputies completed a protective sweep of the home and determined the only other occupants—small children—were fast asleep. Second, the argument assumes that the gun was accessible to the children, a fact not known at the time the deputies questioned Mr. Mulato. Third, the logical extension of this argument is that police have the right to question a suspect in custody about the location of a gun without first *Mirandizing* the suspect any time children are present. No court has ever read this narrow exception so broadly. *See United States v. Newsome*, 475 F.3d 1221, 1225 (11th Cir. 2007) (public safety exception applied to protect police who

reasonably believed they were in danger where officers encountered known violent offender suspected of possessing a firearm in a motel room with at least two other people present); *United States v. Ochoa*, ___ F.3d ___, 2019 WL 5491336, at *16 (11th Cir. Oct. 25, 2019) (public safety exception exists to protect police where it was unclear whether there were any other occupants inside the home of an armed robbery suspect); *United States v. Spoerke*, 586 F.3d 1236, 1249 (11th Cir. 2009) (exception applied to question about pipe bombs where officer located in plain view what appeared to be pipe bombs during a traffic stop).

Based on the foregoing, the court finds that Mr. Mulato was in custody. As such, the deputies should have given Mr. Mulato his *Miranda* warnings before asking about the gun's location. Because they did not, the statements are inadmissible.

C. Conclusion

Considering all of the foregoing, the court finds that the gun as well as Mr. Mulato's statements regarding its location are due to be suppressed. Accordingly, the court **GRANTS** the motion to suppress.

**DONE** and **ORDERED** this November 13, 2019.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE